# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| EDDIE FENTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 14 CV 6921 |
| v. | ) | |
| | ) | |
| WEXFORD HEALTH SOURCES, | ) | Judge Jorge L. Alonso |
| INC., et al, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Eddie Fenton, an inmate in the Illinois Department of Corrections ("IDOC"), brings this action against defendants Wexford Health Sources, Inc., ("Wexford"), Ghaliah Obaisi as Independent Executor of the Estate of Saleh Obaisi ("Obaisi")[1], and Dr. Anne Hundley Davis ("Dr. Davis") for violating his Eighth Amendment Rights under 42 U.S.C. § 1983 for deliberate indifference to his serious medical needs. Fenton alleges that the individual doctors delayed his care and provided him with ineffective treatment, and further alleges that Wexford's referral policy and medical decision-making processes resulted in his prolonged pain and suffering. Before the court is defendants' motion for summary judgment [78]. For the reasons set forth below, defendants' motion is granted.

## BACKGROUND

Eddie Fenton arrived at Stateville Correctional Center on December 18, 2012.[2] On August 12, 2013, he was kicked in the testicles during a game of basketball. (Defs' SOMF ¶ 1.) Shortly

---

[1] On March 16, 2018, Ghaliah Obaisi, Independent Executor of the Estate of Saleh Obaisi, was substituted as a defendant in this case pursuant to Fed. R. Civ. P. 25(a). (Dkt. 99.)
[2] He entered Stateville with a pre-existing gunshot injury unrelated to the injury in this case. (*See* Defs.' SOMF ¶ 9.)

thereafter, he alleges that he began to suffer from gross hematuria (blood in his urine)[3] and other continued general pain. (*Id.*)

Two days after the incident, Fenton saw a nurse and physician's assistant (PA) and underwent a physical examination and urinalysis and was given Tylenol for discomfort. (*Id.* ¶ 10-11.) On September 5, 2013, Fenton met with the same PA, who diagnosed him with a urinary tract infection based on the results of the urinalysis. (*Id.* ¶ 15.) He was prescribed the antibiotic Bactrim and ordered to return for a follow-up urinalysis in three weeks. (*Id.*)

On October 3, 2013, Fenton met with Dr. Davis, and there is a dispute between the parties about whether Fenton's condition had improved or worsened with respect to his urinary pain. However, it is undisputed that he reported occasional vomiting at which time Fenton attributed to his medications. (*Id.* ¶ 16.) Dr. Davis ordered a repeat urinalysis with culture and sensitivity studies to evaluate for the presence of infection. (*Id.*) Three weeks later, on October 24, 2013, Fenton met with Dr. Davis again, and she diagnosed him with hematuria. (*Id.* ¶¶ 17-18.) She then referred him to Dr. Obaisi, the Stateville Medical Director. (*Id.* ¶¶ 17-18.)

On October 30, 2013, Fenton met with Dr. Obaisi, who ordered a complete blood count (CBC) to evaluate anemia and blood tests to evaluate his prothrombin time (PT) and partial thromboplastin time. (*Id.* ¶¶ 20-21.) He also ordered a urine sample for dipstick chemical testing at Stateville and off-site microscopic testing at University of Illinois (UIC) with culture studies, (*Id.* ¶ 21), the results of which showed inconsistencies with gross hematuria. (*Id.* ¶ 22.)

---

[3] Hematuria is a condition where blood is found in the urine. According to Dr. Obaisi, gross hematuria is found when a person can visually see blood in the urine. Microscopic hematuria is found when a sample of urine contains at least three red blood cells under a microscopic. (Dep. of Dr. Saleh Obaisi, 45:17-24, 46:1-4.)

Soon after, in either late October or early November, Dr. Obaisi requested approval for a renal/bladder ultrasound to further investigate the cause of the hematuria.[4]  (*Id.* ¶ 23.)   In December, the ultrasound was approved and later conducted by a radiology service called Precise Specialty.  (*Id.* ¶ 24.)  The ultrasound revealed that Fenton's hematuria did not result from a kidney stone.  (*Id.* ¶ 26.)

On January 25, 2014, Dr. Davis reviewed the ultrasound results, which indicated no visible mass or anatomical injury or defect that would account for the presence of hematuria.  (*Id.* ¶ 27.)

On February 18, 2014, Dr. Obaisi obtained approval for Fenton's off-site referral for a urology consultation at UIC.  (*Id.* ¶ 28.)

On March 10, 2014, he obtained approval to have Fenton seen at Advanced Urology Associates ("AUA") so that Fenton could be seen by a urologist more quickly.  (*Id.* ¶ 29.)  By April 10, 2014 Fenton had an appointment with Dr. Sandeep Sawhney at AUA.  (*Id.* ¶¶ 29-31.)

The April 10th appointment with Dr. Sawhney included an examination of Fenton's abdomen, bladder/kidneys, and genitourinary systems, a urinalysis, and a urine cytology test to check for the existence of malignant cells in the urine.  (*Id.* ¶ 31-33.)  The physical examination came back normal, and the urine cytology test indicated no malignant cells.  (*Id.*)  However, the urinalysis results showed trace amounts of blood.  (*Id.*)  Dr. Sawhney then recommended a CT scan of Fenton's urinary tract for calculus, which was approved on May 19, 2014.  (*Id.* ¶¶ 35, 37.)  However, this procedure was not performed until October 9, 2014.  (*Id.* ¶¶ 35, 37.)[5]

---

[4] The parties dispute whether Fenton continually experienced gross hematuria.  However, is it undisputed that he did suffer from microscopic hematuria with occasional bouts of gross hematuria.

[5] It was reviewed later by a doctor at the Presence St. Joseph Medical Center, which came back as normal with no urinary calculus or pathology.  (*Id.* ¶ 38.)

After the procedure on October 9, 2014, Fenton next saw a doctor for his hematuria or groin/urinary-related pain until April 15, 2015. (*Id.* ¶ 40.) At this appointment, held at UIC, he complained of pain during urination. (IDOC Medical Records, Exhibit G at 138.) The doctor then collected a urine sample and a Clin Chem I profile. (Defs' SOMF ¶ 42.) The doctor also conducted a urinalysis and a culture test, and recommended a CT scan and a cystoscopy, which was later approved on April 21, 2015. (*Id.* ¶¶ 42-43.)

The CT scan took place a week later, on April 28, 2015. (*Id.* ¶ 44.) The cystoscopy procedure took place around 7 weeks later, on June 17, 2015. (Defs' SOMF ¶ 46.) Dr. Shapiro, the urologist who performed the cystoscopy, proscribed the antibiotic Cipro and recommended a Cipro regimen for Fenton. (*Id.* ¶¶ 47-48.) Fenton received that medication on August 28, 2015. (Pl's SOMF ¶ 98.)

At a follow-up urology appointment at UIC on September 23, 2015, Fenton denied symptoms of urinary urgency, hematuria, incontinence, nocturia and dysuria. (*Id.* ¶ 51.) Although he finished the antibiotics, he reported that he has "on and off" pain with urination. (*Id.* ¶ 55.)

### Fenton's Grievances

On August 20, 2013, Fenton filed Grievance M779, where he complained of the following:

> On August 15, 2013 I went to the H.C.U to be seen by the medical staff because I was pissing blood and I was re-schedule by doctor Asst Ms. Williams to be seen on 8-19-13 to see if it is still going on and on that day I talk to nurse Bogus and he said he talk to the doctor and they said they will see me the very next day for my check up that will take place on 8-20-13 but when I ask the morning nurse she said she will check but never did so I ask officer Bowling he said he call and the shift commander Lakey said there we be no move today but right after that they call two people to lab at the H.C.U what's different from me and them and I am bleeding from my testicle. And Doctor Davis order for me to give some blood why she see what going on with my heart, but I will deny for 9-19-13 and 8-20-13.

(Dkt. 79-5, pgs. 8-9.) Fenton requested the following relief: "I am not satisfy how I was lied to by officer staff and medical staff." (*Id.*) Fenton marked the grievance as an emergency, but the

reviewing official determined that an emergency was not substantiated and that Fenton should submit the grievance in the normal manner. (*Id*.) On October 14, 2014, prison officials responded to Fenton's grievance, recommending "no action as it appears that grievant is receiving appropriate medical care." (Dkt. 79-5, p. 7.) The Chief Administrative Officer concurred with this recommendation on October 21, 2014. (*Id*.) On July 15, 2015, the Administrative Review Board denied Fenton's final appeal with respect to that grievance. (Defs' SOMF ¶ 7.)

On February 8, 2014, Fenton filed Grievance 442, where he complained of not being seen for his complaints of heart palpitations and blood in his urine. (Dkt. 79-5, p. 12.)

It is undisputed that Fenton only pursued Grievance M779 all the way through to the Administrative Review Board. (Defs' SOMF ¶ 5.)

## STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *See Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Talanda v. KFC Nat'l Mgmt. Co.*, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013).

**DISCUSSION**

Exhaustion of Administrative Remedies

Defendants assert that they are entitled to summary judgment because Fenton failed to exhaust his administrative remedies before filing this complaint. The Prison Litigation Reform Act requires an inmate to exhaust institutional administrative remedies before filing a lawsuit seeking redress for circumstances or occurrences at a correctional facility. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002); 42 U.S.C. § 1997e(a). The Court must consider whether a plaintiff has satisfied the exhaustion requirement before it reaches the merits and must dismiss a lawsuit or any individual claim(s) that an inmate has failed to exhaust. *Jones v. Bock*, 549 U.S. 199, 221-22 (2007); *Massey v. Wheeler*, 221 F.3d 1030, 1033 (7th Cir. 2000); *Perez v. Wisconsin Dep't. of Corrections*, 182 F.3d 532, 535 (7th Cir. 1999). To exhaust his administrative remedies, an inmate must take all the steps required by the institution's grievance system, *Ford v. Johnson*, 362 F.3d 395, 397 (7th Cir. 2004); *Pozo v. McCaughtry*, 286 F.3d 1022, 1023-24 (7th Cir. 2002), giving prison officials a chance to resolve part or all of the issue and thereby potentially "narrow a dispute or avoid the need for litigation." *Perez*, 182 F.3d at 537. The purpose of the exhaustion requirement is to alert the state to the problem and invite corrective action. *Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir. 2004). A prisoner must exhaust his grievances in accordance with prison procedural rules. *Woodford v. Ngo*, 548 U.S. 81 (2006). The last level of appeal for a prisoner pursuing a grievance in Illinois is a final determination by the Director. 20 Ill. Admin. Code 504.850(a)-(f). Exhaustion is an affirmative defense, and the burden of proof is on the defendants. *Jones*, 549 U.S. at 203; *Maddox v. Love*, 655 F.3d 709, 720 (7th Cir. 2011).

Defendants assert that Fenton only brought the grievance labeled M779 to the final level of appeal, and that grievance did not address the claims alleged in the complaint here. Fenton

agrees that only a single grievance was taken fully though the appeals process but claims that grievance M779 is sufficient to meet the exhaustion requirement for all claims stated in this case, citing *Turley v. Rednour*, 729 F.3d 645, 648 (7th Cir. 2013). However, *Turley* is distinguishable from this case because in *Turley* the prisoner plaintiff complained of an illegal lockdown process at his facility. *Id.* at 650. The court found that he did not have to file a grievance every time a lockdown was held in the prison, and that one fully exhausted grievance would suffice to challenge the lockdown process since every lockdown was the same. *Id*.

The exception defined in *Turley* was designed to prevent the need for redundant grievances, but that is not applicable to this case. Here, Fenton's fully exhausted grievance involves his dissatisfaction with staff allegedly lying to him about a restriction on movement and his inability to go to his checkup (for issues related to his groin and heart) on August 20, 2013. His amended complaint, on the other hand, alleges a variety of violations over a long period of time, including a (1) delay of diagnostic testing recommended by an outside urologist, and a (2) failure to (a) perform alternative diagnostic testing to rule out an infectious cause for gross hematuria, (b) properly treat Fenton's gross hematuria, (c) perform proper testing to diagnose the extent of Fenton's gross hematuria, (d) provide a plan of any additional medical care, and (e) establish and implement a policy to address the needs of inmates with serious medical conditions. He complains that there was an unconstitutional delay in seeing a specialist, getting a CT scan, receiving medication, and having a cystoscopy. These allegations go beyond the scope of Fenton's only exhausted grievance. While Grievance M779 does mention issues with Fenton's groin, the Grievance focuses on the fact that Fenton was unable to attend his August 20th appointment. And Fenton later had several appointments, with a variety of nurses, doctors, and other specialists. Moreover, Fenton only names Dr. Davis for his heart issues in Grievance M779. Finally, although

Fenton filed another grievance related to his hematuria, he did not exhaust his administrative remedies as to that grievance. Accordingly, because Fenton did not properly exhaust his administrative remedies, summary judgment is granted in favor of defendants.

## CONCLUSION

For the reasons stated above, Defendants Wexford Health Sources, Inc., Ghaliah Obaisi as Independent Executor of the Estate of Saleh Obaisi, and Dr. Anne Hundley Davis's motion for summary judgment is granted. Civil case terminated.

**SO ORDERED.**

**ENTERED: September 27, 2018**

**HON. JORGE ALONSO**
**United States District Judge**